

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

UNITED STATES OF AMERICA,
<u>ex rel.</u> DARREN RUBIN,

      **Plaintiff,**

v.

STERLING-KNIGHT PHARMACEUTICALS, LLC,
BELCHER PHARMACEUTICALS, LLC,
ARUN KAPOOR,
MIHIR TANEJA,
JUGAL TANEJA,
SUPRIYA TANEJA,
MANJU TANEJA,
WAVERLY CAPITAL, LLC,
CPN BIOSCIENCES, LLC,
ADAM MISCIK,
KERSDALE HOLDINGS, LLC,
THE MISCIK GROUP, LLC,

      **Defendants.**

_____/

CASE NO. 8: 20-cv-564-T-23CPT

**FILED IN CAMERA**
**UNDER SEAL**

## COMPLAINT UNDER THE *QUI TAM* PROVISIONS
## OF THE FALSE CLAIMS ACT AND JURY TRIAL DEMAND

Relator, **DARREN RUBIN** ("Relator" or "Rubin") on behalf of the United States of

America, to recover damages and civil penalties, hereby sues **STERLING-KNIGHT**

**PHARMACEUTICALS, LLC, BELCHER PHARMACEUTICALS, LLC, ARUN**

**KAPOOR; MIHIR TANEJA, JUGAL TANEJA, SUPRIYA TANEJA, MANJU TANEJA**

**("TANEJAS"); WAVERLY CAPITAL, LLC, CPN BIOSCIENCES, LLC, ADAM MISCIK,**

**KERSDALE HOLDINGS, LLC, THE MISCIK GROUP, LLC**, and any related entities

(collectively "Defendants") pursuant to the Federal Civil False Claims Act, Title 31 U.S.C. §3729

1

el seq., ("FCA") and the Anti-Kickback Statute, 42 U.S.C. §1320a-7b(b) (the "AKS"), to recover treble the damages actually sustained by, and civil penalties and restitution owed to, the United States as a result of Defendants' massive and wide reaching scheme to commit fraud against the Medicare and TRICARE programs.

## I.   INTRODUCTION

1.      Relator's *qui tam* action alleges that Defendants knowingly and willfully combined, conspired, and agreed to deceive tens of thousands of patients and hundreds of physicians, including in the Middle District of Florida and elsewhere, for the purpose of executing a scheme and artifice to defraud health care benefit programs, and to obtain by means of false and fraudulent pretenses, representations, and promises in connection with the delivery of and payment for health care benefits, items or services, and, in furtherance thereof, caused to be submitted these fraudulent claims for payment.

2.      In carrying out this fraud, Defendants knowingly (a) presented or caused to be presented false claims to obtain payments; (b) made or caused to be made or used false records or statements material to these false claims; (c) conspired to cause these claims to be presented and/or these records or statements to be made or used; and (d) made, used, or caused to be made or used, a false record or statement material to an obligation to pay or transmit money or property, or knowingly concealed or knowingly and improperly avoided or decreased an obligation to pay or transmit money or property.

3.      As set forth below, as part of this scheme, Defendants engaged in a scheme to have physicians provide misbranded medical devices and in-office durable medical equipment ("DME") supplies of wound care products to patients that were adulterated and/or misbranded and

not medically necessary. CPN BIOSCIENCES, LLC utilizes a software program which would detail the information necessary to determine the specifics of claims submitted for payment.

4.      As set forth below, as part of this scheme, Defendants engaged in a scheme to have physicians prescribe products with an Inflated Average Wholesale Price ("AWP") from STERLING-KNIGHT PHARMACEUTICALS ("STERLING"), which were marketed to physicians. Associated private pharmacies billed the prescription medications at the public AWP, which in reality far exceeded the actual purchase price. This deceitful practice was contrary to the pharmacy benefit management companies' ("PBMs") provider agreements. Defendants sold the inflated AWP medications to these private pharmacies for a fraction of the AWP. Claims were submitted for payment to the PBMs which misrepresented that the purchase prices for medications was equal to the manufacturer reported prices. It is unknown if patient co-pays were collected. At least one drug product came from BELCHER PHARMACEUTICALS, while most other products came from STERLING, which is indirectly owned by the TANEJAS and operated out of BELCHER in Largo, Florida and disguised to be a Mississippi entity. CMS and TRICARE ("Payers") can readily track reimbursements of STERLING products' NDC numbers to expose the private pharmacies and physicians involved in this fraud scheme, and the actual amounts and totals billed with these false claims.

5.      This Complaint has been filed *in camera* and under seal pursuant to 31 U.S.C. §3730(b)(2). It will not be served on Defendants unless and until the Court so orders. A copy of the Complaint, along with written disclosure of substantially all material evidence and information that Relator possesses, has been served upon the Attorney General of the United States and on the United States Attorney for the Middle District of Florida pursuant to 31 U.S.C. §3730(b)(2) and Fed. R. Civ. P. 4(d).

3

## II.   **PARTIES**

6.     Plaintiff the United States of America brings this action by and through Relator.  At all times relevant to this Complaint, the United States, acting through the Centers for Medicare & Medicaid Services ("CMS") and the Defense Health Agency ("DHA"), has reimbursed Defendants for the provision of various medications for eligible individuals through the Medicare and TRICARE programs.

7.     The United States brings this action on behalf of its agencies, CMS and Health and Human Services ("HHS") on behalf of the Medicare program and the DHA, a component of the Department of Defense, for TRICARE (formerly known as CHAMPUS) which is a federal health care program, as defined in the AKS, 42 U.S.C. §1320a-7b, which is administered by DHA, and provides health care insurance for active duty military personnel, military retirees, and military dependents.

8.     Relator is a citizen of the Middle District of Florida who brings this action on behalf of himself and the United States.

9.     At least as early as 2011, Defendants engaged Relator to assist in consulting.  The scope of the consulting quickly grew, and in February 2015, Relator became an employee, Chief Scientific Officer, of Defendants.

10.     As a result of Relator's association with Defendants, Relator became aware of Defendants' actions which now appear to Relator to be a wide-ranging plan of defrauding Medicare and TRICARE.

11.     At all times relevant to this complaint, CPN BIOSCIENCES, LLC ("CPN") was a Florida Limited Liability Company with its principal office initially at 12393 Belcher Road, Suite 420B-front, Largo, FL 33773; an office within BELCHER PHARMACEUTICALS, LLC

4

("BELCHER") at 12393 Belcher Road, Suite 420, Largo FL 33773; and later at 6925 112th Circle N, Suite 102, Largo, FL 33773; an office in a building located behind BELCHER's primary address (and KERSDALE HOLDINGS, LLC's primary address) at 6911 Bryan Dairy Road, Largo, FL 33777.  CPN also had a temporary office in the vitamin shop of Judith (Bartell) Goodman, BELCHER's and CPN's former chief financial officer, at 240 107th Avenue, Treasure Island, FL 33706.

   12.   At all times relevant to this complaint, CPN was owned and operated by KERSDALE HOLDINGS, LLC; which is owned by the TANEJAS, the same owners and operators of BELCHER; and THE MISCIK GROUP, LLC, which is owned and operated by ADAM MISCIK located at 371 Channelside Walk Way, Unit 1502, Tampa, FL 33602.

   13.   At all times relevant to this complaint, BELCHER PHARMACEUTICALS, LLC ("BELCHER") was a Florida Limited Liability Company with principal office at 6911 Bryan Dairy Road, Largo, FL 33777 and owned and operated by the TANEJAS.  More specifically, BELCHER is owned by: MIHIR TANEJA as an individual, KRONOS CAPITAL, LLC (owned fully by MANDEEP TANEJA TRUST), and MANJU HOLDINGS, LLC (owned fully by MANJU TANEJA TRUST).

   14.   At all times relevant to this complaint, STERLING-KNIGHT PHARMACEUTICALS, LLC ("STERLING") was a Nevada Limited Liability Company.

   15.   Since September 2014, STERLING was indirectly owned by the TANEJAS and operated out of BELCHER's Largo, Florida office address.

   16.   STERLING is believed to be registered with managing member ARUN KAPOOR, who is BELCHER's Director of Business Development, to conceal ownership of, and economic and controlling interests in, by the TANEJAS.

17.     The STERLING website and Food and Drug Administration ("FDA") drug establishment and medical device establishment listings have an address of 106 East Mulberry Street in Ripley, Mississippi 38663 for STERLING to conceal operations of STERLING out of BELCHER in Largo, Florida. The Mississippi address was selected for the relative dearth of FDA presence in Mississippi to avoid and/or pass FDA inspection.

18.     At all times relevant to this complaint, ARUN KAPOOR resides at 12948 Terrace Springs Drive, Temple Terrace, FL 33637 and commuted to work by car to his Largo, Florida office inside BELCHER, where he worked for both BELCHER and STERLING.

19.     At all times relevant to this complaint, MIHIR TANEJA lived at 371 Channelside Walk Way, Unit 1601, Tampa, FL 33602 and commuted to work by car to his Largo, Florida office inside BELCHER, where he worked for both BELCHER and STERLING. MIHIR TANEJA later moved to 526 Riviera Drive, Tampa, FL 33606.

20.     JUGAL TANEJA, MANJU TANEJA, and SUPRIYA TANEJA reside at 3507 Bayshore Boulevard, Unit 1801, Tampa, FL 33629. Both JUGAL TANEJA and SUPRIYA TANEJA commuted to work by car to their Largo, Florida office inside BELCHER, where they worked for both BELCHER and STERLING.

21.     Since September 2018, WAVERLY CAPITAL, LLC ("WAVERLY") had a principal address located at the home of JUGAL TANEJA, MANJU TANEJA, and SUPRIYA TANEJA at 3507 Bayshore Boulevard, Unit 1801, Tampa, FL 33629.

22.     Upon information and belief, the TANEJAS own 90% of WAVERLY, while ARUN KAPOOR owns 10% of WAVERLY.

23.     SUPRIYA TANEJA, MIHIR TANEJA, JUGAL TANEJA, and ARUN KAPOOR are managing members of WAVERLY.

6

### III.   JURISDICTION AND VENUE

24.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331, because this action is brought for violations of the False Claims Act, 31 U.S.C. §3729 et seq. (as amended), a federal statute.

25.    The Court has personal jurisdiction over Defendants because Defendants (a) are residents of and/or transact business in this District; and (b) have carried out the fraudulent scheme in this District.

26.    Venue is proper in this District pursuant to 31 U.S.C. §3732(a) and 28 U.S.C. §1391 (b)(2), because Defendants can be found in, are licensed to do business in, and transact or have transacted business in this District, and the events and omissions that give rise to these claims have occurred in this District.

27.    The Complaint has been filed within the period prescribed by 31 U.S.C. §§3731(b) and 3730(h)(3).

### IV.   NO PUBLIC DISCLOSURE; DIRECT AND INDEPENDENT KNOWLEDGE OF VIOLATIONS OF THE FALSE CLAIMS ACT

28.    There has been no public disclosure, relevant under 31 U.S.C. §3730(e), of the "allegations or transactions" in this Complaint.

29.    Relator makes the allegations in this Complaint based on his knowledge, experience and observations.

30.    Relator is the original source of the information on which the allegations herein are based, has direct and independent knowledge of such information, and has voluntarily disclosed such information to the United States.

## V.  BACKGROUND

31.  The FCA establishes liability to the United States for an individual who, or entity that, "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." 31 U.S.C. §3729(a)(1)(A).  "Knowingly" is defined to include actual knowledge, reckless disregard, or deliberate indifference. *Id.* at §3729(b)(1).  No proof of specific intent to defraud is required.  Id.

32.  The Anti-Kickback Statute ("AKS") arose out of congressional concern that inducements may corrupt patient and professional health care decision-making, impose higher costs on federal health care programs, and divert federal funds towards goods and services that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the federal health care programs from these harms, Congress enacted a prohibition against the payment of kickbacks in any form.  The AKS makes it illegal for an individual or entity to knowingly or willfully:

> [O]ffer[] or pay [] any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
> (A)     to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or
> (B)     to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program.

33.  A claim for reimbursement from a federal health care program for items or services resulting from a violation of the AKS "constitutes a false or fraudulent claim" under the FCA. 42 U.S.C. §1320A-7b(g).

34.  The AKS contains several exceptions in which the prohibition against providing compensation in exchange for referrals or orders do not apply.  The "bona fide employment"

exception provides that "any amount paid by an employer to an employee (who has a bona fide employment relationship with such employer) for employment in the provision of covered items or services" will not violate the AKS. 42 U.S.C. §1320a- 7b(b)(3)(B).  This type of compensation to bona fide employees is exempt from the statute's prohibitions because the control that employers exercise over bona fide employees reduces the potential for abuse. *See* Medicare and State Health Care Programs: Fraud and Abuse; OIG Anti-Kickback Provisions, 56 Fed. Reg. 35952 (July 29, 1991).

35.   The FCA reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345, at 1 (1986).  As relevant here, the FCA establishes treble damages liability for an individual or entity that:

> (A)   knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> (B)   knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C)   conspires to commit a violation of subparagraph (A) [or] (8) ... [or]
>   * * *
>
> (G)   knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government

31 U.S.C. §3729(a)(1).

36.   The FCA defines a "claim" to include, in pertinent part:

> (A)   ... any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that -
>
> (i)   is presented to an officer, employee, or agent of the United States; or
>
> (ii)   is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government -

9

(I)     provides or has provided any portion of the money or property requested or demanded; or

(II)    will reimburse such contractor, grantee, or other recipient any portion of the money or property which is requested or demanded .. .

*Id.* §3729(b)(2) (emphasis added).

37.    "Knowing," within the meaning of the FCA, is defined to include reckless disregard and deliberate indifference. *Id.* §3729(b)(I).

38.    In addition to treble damages, the FCA also provides for assessment or a civil penalty for each violation or each false claim.

39.    The FCA provides for payment of a percentage of the United States' recovery to a private individual who brings suit on behalf of the United States under the FCA. *See* 31 U.S.C. §3730(d).

## VI.    HEALTHCARE FRAUD ALLEGATIONS

### A.  CPN's DME Fraud

40.    Medical devices provided to patients and physicians through CPN were adulterated or misbranded as drug products having CPN's National Drug Code ("NDC") numbers appearing on CPN medical device products, through the year 2020, even well after CPN's NDC number 69992 was inactivated by the Food and Drug Administration ("FDA") in August 2016.

41.    CPN-labeled products containing an NDC number include those in the table below.

**Table of Products Used in the CPN Biosciences Scheme**

| CPN Biosciences Labeled Devices | NDC number | HCPCS code | CMS reimburse* |
|---|---|---|---|
| **Nuvagen Collagen Powder 1 gram** | **69992-110-15** | **A6010** | **$35.98 each** |
| Nuvafoam Foam Dressing | 69992-3011-10 | A6209 | $8.68 each |
| Nuvaguard Hydrocolloid Dressing | 69992-3014-20 | A6234 | $7.60 each |
| Nuvagel Hydrogel Sheet | 69992-3034-10 | A6242 | $7.04 each |
| Nuvashield Calcium Alginate Dressing | 69992-3026-10 | A6196 | $8.55 each |
| Nuvashield AG Silver Calcium Alginate | 69992-3030-10 | A6196 | $8.55 each |

| Nuvagen Collagen Pad Dressing | 69992-1002-05 | A6021 | $24.42 each |
|---|---|---|---|
| Nuvawrap conforming stretch gauze band | 69992-3103-12 | A6443 | $0.32 per yard |
| Nuvasorb surgical sponges (gauze) | 69992-3322-50 | A6402 | $0.13 each |
| Nuvadhere waterproof adhesive tape | 69992-3656-10 | A4452 | $0.41 per 18" |
| Not Labeled for CPN Biosciences | NDC number | HCPCS code | CMS reimburse* |
| Curity AMD antimicrobial gauze sponge | none available | A6222 | $2.48 each |

* Durable Medical Equipment Coding System ("DMECS") fee schedule as of February 2020

42.     The NDC numbers appearing on CPN-labeled products gave the false and misleading implication that CPN products were of pharmaceutical grade or quality, or were thought at least superior to similar medical device products on the market not having NDC numbers.  It is unknown if CPN products were also attempted to be reimbursed as drug product benefits through pharmacies.  In contrast, the Covidien wound care product, Curity AMD antimicrobial gauze sponge, properly has no NDC number assigned to it as a medical device.

43.     Defendants were advised in July 2016 by the FDA Center for Drug Evaluation and Research ("CDER") Office of Compliance that:

> The labeler code is a unique 4- or 5-digit number assigned to any company that manufactures or distributes drug(s). Firms use this FDA assigned labeler code to compose a unique National Drug Code (NDC) for drugs they manufacture or distribute for commercial distribution in the United States. This NDC number is reported by labelers as part of their drug listing requirements. It is used by the FDA for surveillance and regulation of the pharmaceutical industry. It is also used by the Centers for Medicare and Medicaid Services ("CMS") as well as other government agencies and the medical insurance industry for reimbursement and other medical benefits. **Assignment of NDC numbers to non-drug products is extremely prohibited.** Furthermore, assignment of an NDC does not denote approval or endorsement of the firm or its products by the FDA.  Any representation that creates an impression of such approval or endorsement because of the possession of an NDC is misleading and may **constitute misbranding, resulting in legal action.**"

44.     Nuvagen Collagen Powder is the primary medical device product manufactured by BELCHER for CPN.

11

45.     Nuvagen Collagen Powder was commercialized without Food and Drug Administration ("FDA") 510(k) premarket notification, and therefore, Defendants have attempted and conspired to commit health care fraud in violation of 18 U.S. Code §1349; along with 21 U.S. Code §331, 21 U.S. Code §333, and 21 U.S. Code §353.

46.     Nuvagen Collagen Powder is labeled with the intended use shared with Collagen Wound Dressing medical device products requiring a 510(k) in FDA Product Code KGN; an intended use for the management of burns, sores, blisters, scrapes, ulcers and other wounds including the management of first- and second-degree burns, partial thickness wounds, pressure ulcers (stages II – IV), and light to heavily exudating wounds.

47.     However, Nuvagen Collagen Powder remained incorrectly and falsely listed with the FDA with 510(k) Exempt medical device product code KOZ, pertaining to Hydrophilic Wound Dressings.

48.     Exempt medical device product code KOZ is regulated by 21 CFR 878.4018; "A hydrophilic wound dressing is a sterile or non-sterile device intended to cover a wound and to absorb exudate. It **consists of nonresorbable materials** with hydrophilic properties that are capable of absorbing exudate (e.g., **cotton**, cotton derivatives, alginates, dextran, and **rayon**). **This classification does not include a hydrophilic wound dressing** that contains added drugs such as antimicrobial agents, added biologics such as growth factors, or is **composed of materials derived from animal sources**." (emphasis added).

49.     Nuvagen Collagen Powder is derived from animal sources as it is comprised of cow hide collagen.

50.     Nuvagen Collagen Powder is a resorbable material that is resorbed by the body and dissolves in fluids like wound exudate and water.

12

51.     Nuvagen Collagen Powder does not function with an intended use in the KOZ product code; i.e., Nuvagen is unlike a cotton ball or surgical sponge used to soak up wound exudate and be removed and discarded.

52.     According to the FDA, "Under 18 U.S.C. §1001, anyone who makes a materially false, fictitious, or fraudulent statement to the U.S. Government is subject to criminal penalties." This includes when listing medical device establishments and products with the FDA, including BELCHER and SUPRIYA TANEJA (BELCHER's Official Correspondent with FDA).

53.     Nuvagen Collagen Powder manufactured by BELCHER also tested positive for cytotoxicity (being toxic to cells) and pyrogenicity (fever inducing), which MIHIR TANEJA had BELCHER conceal from the FDA.

54.     Nuvagen Collagen Powder also uses "food grade" protein powder.

55.     CPN also violated the federal anti-kickback statute 42 U.S.C. §1320a–7b(b), and Section 1877 of the Social Security Act (42 U.S.C. 1395nn), also known as the physician self-referral law and commonly referred to as the "Stark Law," with a volume-based program which incentivized physicians to prescribe wound care products through the CPN scheme for longer durations (i.e., 15-day and 30-day kits), and for greater number of wounds, than may have been reasonable or necessary.

56.     Upon information and belief, pre-printed prescription pads or forms for CPN products only included a check box for 15-day or 30-day supplies when ordering through CPN and its proprietary software.

57.     CPN's proprietary software for physicians and physicians' web-based portal was developed by Belcher employee(s) with MIHIR TANEJA's oversight.

13

58.     Upon information and belief, physicians were unable to prescribe CPN wound care products for any smaller number of days, or any intermediary number of days. It is further believed that most physicians were trained by CPN and incentivized to prefer and select the 30-day supply kit for their patients.

59.     Physicians enter into contractual agreement with CPN in the nature of a joint venture.

60.     CPN assists credentialing the physicians to obtain a Provider Transaction Access Number (PTAN) to bill Medicare and Medicaid for wound care supplies and provides physicians with CPN's proprietary software, while CPN also does the logistics and mail order to the patients' homes.

61.     CPN charges the physician approximately $12 for each Nuvagen Collagen Powder packet that they distribute to the patient.

62.     CPN also charges the physician a "service charge" of approximately $4 to $5, per wound per day; for an approximate total of about $16 per wound per day.

63.     The CPN service charge is believed mandatory, bundled and built-in to the pricing model for every primary dressing product.

64.     The service charge includes use of CPN's proprietary software and CPN's patient insurance benefit verification, CPN providing CMS-1500 claim forms with codes and organization of such forms, and wound care product kit packing and shipping to the patient.

65.     Physicians receive as profit the difference between the $35 reimbursement per wound per day that is paid for the Nuvagen Collagen Powder and CPN's charges of approximately $16 for this product with service fee.

14

66.     Therefore, physicians profit at or about $19 per wound per day in this volume-based scheme.  In other words, profits are split between CPN and the physician; CPN keeps about 46% of the profit, while the physician keeps about 54% of the profit on each wound.

67.     Upon information and belief, the cost of Nuvagen Collagen Powder to Defendants is believed almost negligible; believed to cost mere pennies per gram.

68.     The CPN business model to physicians is arguably both a volume-based and percentage-based contractual arrangement between CPN and its physicians.

69.     The fee for CPN services is attached to each product, varying with the volume over value of referrals; the more products ordered for a patient per wound per day, the more money CPN, and the physician, brings in.  For example, CPN may receive $5 in service charge for a patient with one wound in a day, while CPN may receive $20 in service charges for a patient with four wounds in a day. In contrast, because of CPN's approximately $4 to $5 service charge to physicians per wound per day, physicians are deterred and/or penalized if they were to prescribe and order a primary dressing with a lower CMS reimbursement than Nuvagen Collagen Powder, such as a Hydrogel Sheet with a reimbursement of around $7 (HCPCS code A6242).  In other words, the physician may make much lower profit, no profit, or actually come out negative if they ordered a primary dressing with a lower reimbursement and still had to pay CPN for the product cost and the service fee. For this reason, physicians were educated and coerced by CPN to order Nuvagen Collagen Powder for nearly all wounds.

70.     CPN represents itself as a "turn-key" solution for physicians to make a lot of money on profitable DME supplies.  CPN trained these physicians how to document medical need to help ensure that CMS would reimburse these collagen products for the full 30 days.  Without

documenting or extending medical need, collagen product supplies may not be reimbursed or only receive coverage for a few days.

71.     CPN, which Defendants sometimes refer to as the "Collagen Provider Network," trained and incentivized physicians to use Nuvagen Collagen Powder primarily, instead of other lower reimbursement primary dressings.

72.     Nuvagen Collagen Powder can be very messy and cumbersome for patients to apply to their wounds at home and cover with secondary bandages. It is believed that if a 30-day supply kit was ordered that included thirty Nuvagen Collagen Powder packets and thirty secondary bandages and tapes, that patients would only use a few of each and discard the rest. This is believed to result in much waste to Payers.

73.     There were over 1,100,000 (or 1.1 million) Nuvagen Collagen Powder gram packets provided to patients at a CMS reimbursement of around $35 each with HCPCS code A6010 (see Table), the majority of which may have been unused and/or discarded by patients once received in the mail from CPN as a bulk multi-day kit.

74.     The majority of CPN's patients (at least 60%) are believed to have been Medicare patients.

75.     According to CPN's advertising to physicians,

CPN Biosciences provides an online reconciliation program in order to simplify payment remittance, ensure accuracy in accounts receivable reporting, and eliminate paper remittances and checks. Reimbursements are deposited directly into the practice's account, and the funds are available as soon as they are cleared by your depository institution... CPN has a proprietary software that processes patients' information through their health insurance; verifies benefits, validates and adjudicates claims, including distribution of primary and secondary insurance payments. This helps because the accuracy of CPN's claim adjudications expedite practice remittances... Our on-boarding team will assist with completing and submitting all necessary documents on behalf of the practice in order to ensure that the physicians are properly credentialed and contracted with third party payors. No other company currently offers this critical service of assistance with insurance credentialing, so that you can start receiving reimbursements quickly... CPN's program allows for you to process wound care supplies directly through the

16

patient's insurance… We provide all the tools necessary for Physicians to operate their own DME wound care business. CPN takes the difficulties of operating a wound care DME and manages the process so the Physician can focus on what they do best, treating the patient. **CPN acts as an extension to the physician practice** by providing all necessary support in order for Physicians to efficiently operate a wound care DME business.

76.      Support is believed to include medical claims and DME billing support service and guidance.

77.      CPN advertises that it is legal for physicians to dispense wound care products in the office, which may comply with Stark regulations. But these advertisements purposely fail to mention that the mail order shipments of 30-day product kits direct to the patients' homes from CPN's warehouse is not in-office dispensing.

78.      It is also not known how and if co-pays were collected.

79.      Defendants, through CPN, conducted mail fraud in violation of 18 U.S.C. §1341 by shipping thirty-day supply convenience kits of wound care products direct to patients' homes from CPN's warehouse, thereby, bypassing physician in-office dispensing of DME wound care products.

80.      Defendants, through CPN, violated federal Physicians Payments Sunshine Act 42 U.S. Code §1320a–7h and that of individual states.

81.      CPN utilized a software program called CARE 365, to handle the logistics of mailing products (and kits) to patients' homes, along with invoicing physicians for these products with the date of service.

82.      Upon information and belief, this system includes patient, products, address, date delivered, and additional information.

83.      In addition, each product has an HCPCS A code for standardized CMS reimbursement.

84.     Upon information and belief, the CPN software is able to access the physicians' EMR software to capture the purported medical necessity information and forms.

85.     Thus, while it may be that the physician's office submits the claims to CMS, the underlying cause of the submission is the Defendants.

### B. **Fraudulent Medical Foods Vitamins**

86.     The focus of part of STERLING's scheme was the fraudulent sale of vitamins through private pharmacies and prescribing physicians, while labeled and marketed as drug products.

87.     MIHIR TANEJA would source or produce drug products and prescription medical foods (vitamins), assign overly inflated AWPs to them, have draft labels prepared, and submit these products to listing databases such as Medi-Span and First Databank.

88.     Relator witnessed MIHIR TANEJA on a computer manipulating and inflating AWP pricing of vitamins, such as Durachol, before submitting to PBMs, while bragging about it. MIHIR TANEJA assigned NDC numbers to these products and prepared the labeling.

89.     Pharmacies related to the TANEJAS would test-run reimbursements through government Payers like TRICARE and private insurance carriers to ensure good coverage, before commercializing and sending products to pharmacies and patients for this scheme.

90.     In these fraud schemes, misbranded and/or adulterated drug products with inflated AWPs were sold by Defendants to conspiring pharmacies and dispensing physicians at an artificially low cost; much lower than the inflated AWP would suggest; for these items that garner high insurance reimbursements, thereby, providing a large margin of profit for all the conspirators to make this fraud scheme viable.

91.     Workers' compensation insurance programs are believed to have also been affected.

92.     Most products came from STERLING, which is indirectly owned by the TANEJAS and operated out of BELCHER in Largo, Florida and disguised to be a Mississippi entity.

93.     Two of the STERLING products, Cifrazol (NDC 69336-0310-30) and Durachol (NDC 69336-0300-30), were labeled with STERLING's NDC number 69336 and labeled as prescription (Rx) only. The product labels which appear on the National Institutes of Health, U.S. National Library of Medicine, DailyMed website, are labeled in the category as "human prescription drug label" with a marketing status of "unapproved drug other," when these vitamins are in fact not prescription drug products.

94.     Both Cifrazol and Durachol are believed identical.

95.     Both Cifrazol and Durachol are vitamin capsules containing 3775 iU vitamin D (as cholecalciferol) and 1 mg vitamin B9 (as folic acid), both supplied in a 30-count bottle; the only difference being their brand name and AWP.

96.     A bottle of Cifrazol has an AWP of approximately $900, while a bottle of Durachol has an AWP of approximately $600.

97.     Other distribution channels and dispensing physicians had an average reimbursement of $475 and a profit of $110 for Durachol.

98.     The redundancy in these vitamins is believed to have helped when one version was rejected for reimbursement by Payers, and to show other similar products having high AWP.

99.     Similar vitamin supplements can easily be purchased from a vitamin shop or supermarket for well under $20; instead of costing government and private insurance companies nearly $500 or more.

100.    Another vitamin product from STERLING is Macuvex vitamins (NDC 69336-400-60). This is suspected of having an inflated AWP as well, even though similar vitamins are available at supermarkets and vitamin shops for under $20. For other distribution channels and dispensing physicians, Macuvex had an average reimbursement of $340 and a profit of $100.

101.    These STERLING vitamins may also have also been placed on preferred vendor formulary lists for workers' compensation dispensing.

102.    STERLING's Durachol product appears on a Medicaid formulary list as of January 2020 from Community Health Plan of Washington. Durachol also appears on an Aetna Medicare 2019 comprehensive formulary list. Many more examples are believed to exist.

103.    Cifrazol, Durachol, and a host of other STERLING products, e.g., Macuzin (NDC 69336-0800-30), have appeared in a January 2020 Aberrant Products List from the pharmacy benefit management of CVS Caremark. "Providers must not dispense aberrant quantities of a Covered Item and/or high volume of claims within a therapeutic category (e.g. topicals, dermatologicals), as measured by number of claims, quantity dispensed or dollars, inconsistent with the habits of local Prescribers or Plan Sponsor formularies, at Caremark's sole determination. In the event Provider breaches this provision of the Provider Manual, Caremark, on its own behalf, or on behalf of a Plan Sponsor, may terminate the Provider Agreement (or Provider's participation in specific Plans or networks) and may exercise other remedies available to Caremark, including chargeback of applicable claims."

104.    Cifrazol, Durachol, and a host of other STERLING products, e.g., Macuzin (NDC 69336-0800-30), have appeared in a January 2020 Medicare Part D Excluded Drugs List.

105.    Upon information and belief, some bottles of Cifrazol and/or Durachol were adulterated and had non-prescription vitamin D supplement pills placed into bottles and labeled as

20

prescription (Rx) and passed along to represent a pharmaceutical product manufactured at an FDA approved drug manufacturing facility to seek high reimbursements.

106.    Upon information and belief, some Cifrazol and/or Durachol contained vitamin D only without folic acid even though labeled to contain folic acid.

107.    Other STERLING vitamins are believed to have included Methaver (NDC 69336-353-30) and Omnivex (NDC 69336-360-30) multivitamins; and Revesta (NDC 69336-330-30) vitamin D3 5750 iU and folic acid 1 mg capsule; and Ergocal (NDC 69336-0311-30) vitamin D2 capsule.

108.    STERLING vitamins were marketed as though they were prescription drug products and/or marketed as though they were medicinal foods, when in fact they were not.

109.    Defendants engaged in product misbranding under Section 403(a)(1) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. §343(a)(1)), because STERLING's vitamin labels were false and misleading in that the products are labeled and marketed as a medical food but do not meet the statutory definition of a medicinal food in the Orphan Drug Act (21 U.S.C. §360ee(b)(3)) or the criteria set forth in 21 CFR 101.9(j)(8).

110.    The Orphan Drug Act defines "medical food" as "a food which is formulated to be consumed or administered enterally under the supervision of a physician and which is intended for the specific dietary management of a disease or condition for which distinctive nutritional requirements, based on recognized scientific principles, are established by medical evaluation."

111.    The FDA believes that "Medical foods must be for the dietary management of a specific disorder, disease, or condition for which there are distinctive nutritional requirements and must be intended to be used under medical supervision. Patients with such a disorder, disease, or condition must have a limited capacity to ingest, digest, absorb, or metabolize ordinary foodstuffs

or certain nutrients, or have other special medically determined nutrient requirements, which cannot be managed by the normal diet alone. Medical foods are not those simply recommended by a physician as part of an overall diet to reduce the risk of a disease or condition."

112.   Defendants engaged in product misbranding under section 510(e) of the FD&C Act (21 U.S.C. 360(e)) and under 21 CFR 207.35 for including NDC numbers on the labeling and product inserts of the above referenced vitamins, asserting they were medical foods, for which they should not have NDC numbers associated with them.

113.   The purpose of this misbranding was to allude to these vitamin products being of the same efficacy and quality as prescription drug products, when in fact they were not.

114.   Defendants are in violations of the Federal Civil False Claims Act, 31 U.S.C. §3729, et seq. by the submission of false records or statements to the United States through the federal Center for Medicare and Medicaid Services ("CMS") for STERLING's vitamins which are ineligible for federal reimbursement, along with insurance fraud to TRICARE and private carriers.

115.   In addition, upon information and belief, co-pays may not have been properly collected from patients.

C.   **Fraudulent Analgesics**

116.   Another group of STERLING products included analgesic products, including topical and oral analgesic products.

117.   These analgesic products include but are not limited to Fenortho capsules (NDC 69336-0113-10), Lidopril XR (NDC 69336-0826-01), and Lidocaine 5% ointment (NDC 69336-0103-35), which have inflated AWPs.

118.   These products had inflated AWPs which government Payers reimbursed highly for, while these products were sold to pharmacies and dispensing physicians at prices much lower

22

than what the AWP would be so that all conspirators could profit with good margins for these products.

119.    These STERLING drug products are also believed to have been placed on preferred vendor formulary lists for workers' compensation dispensing, including by AUTOMATED HEALTHCARE SOLUTIONS, and are believed to have affected the United States Postal Service workers' compensation.

120.    Fenortho is the STERLING brand name of 200 mg fenoprofen capsule, a brand name created by MIHIR TANEJA.

121.    Fenoprofen is an old, nonsteroidal anti-inflammatory drug (NSAID) drug, originally approved in 1976, but resurrected and marketed as if it was a recently approved drug of better efficacy than other NSAID drugs, such as Ibuprofen. Another brand name includes Nalfon (fenoprofen 400 mg) capsules from XSPIRE PHARMA, Ridgeland, Mississippi, from which MIHIR TANEJA licensed the 200 mg strength from.

122.    Relator was aware of licensing communications between BELCHER and FORD MUNDY of XSPIRE PHARMA in Ridgeland, Mississippi starting around October 2015 for 200 mg fenoprofen.

123.    Relator flew with MIHIR TANEJA and JUGAL TANEJA on their private jet for an in-person meeting with FORD MUNDY of XSPIRE PHARMA and his team on January 12, 2016. During this meeting, high AWP marketing was discussed along with XSPIRE PHARMA showing instant rebate cards for up to $420 in savings from WraSer Pharmaceuticals for Nalfon fenoprofen capsules, and teaching the TANEJAS how to avoid collecting co-pays at their pharmacies.

124.    A product licensing and distribution agreement between XSPIRE PHARMA and BELCHER was executed on February 24, 2016 having an upfront royalty fee of $450,000 and annual minimums, along with FDA product fee and half of the establishment fee paid by BELCHER.    Although though the agreement was with BELCHER, Fenortho became a STERLING product.

125.    The reimbursements for this inflated AWP NSAID product became so costly to insurance companies, that United Healthcare issued a pharmacy step therapy program number 2018 P 3112-1 specifically for STERLING's Fenortho product. "Step Therapy programs are utilized to encourage the use of lower cost alternatives for certain therapeutic classes. This program requires a member to try lower cost alternatives before coverage will be provided for Fenortho or fenoprofen. Fenortho and fenoprofen will be approved based on the following criterion: History of failure, contraindication, or intolerance to THREE of the following (list reason for therapeutic failure, contraindication, or intolerance) oral formulations: diclofenac, flurbiprofen, ibuprofen, ketoprofen, naproxen. Authorization will be issued for 12 months."

126.    Lidopril XR is a lidocaine 2.5% and prilocaine 2.5% topical cream intended for local analgesia in normal intact skin and for application to genital mucous membranes for superficial minor surgery and as pretreatment for infiltration anesthesia. In other words, Lidopril XR is intended for local analgesia use prior to a dermatological clinical procedure, or prior to intravenous cannulation or venipuncture (needle stick injection) to reduce pain, and is believed administered by a healthcare professional or caregiver, or a patient just prior to a painful procedure.

127.    In contrast, STERLING and its network of pharmacies and prescribing doctors are believed to have marketed and/or encouraged Lidopril XR for frequent home use for self-

24

administration for treating general pain as an off-label indication; not infrequent use before a medical procedure.

128.    Chronic overdosing of Lidopril XR could lead to systemic effects and toxicity. The non-STERLING, branded version of this product is EMLA cream. STERLING also had this product labeled as Prilolid (NDC 69336-828-01).

129.    As in the above example of Lidopril XR and Prilolid, different product names and different NDC numbers were used for the same physical product.

130.    MIHIR TANEJA believed in label and product name redundancy in this scheme. When one NDC number was shut down by pharmacy benefit management companies ("PBMs") for abuse or outrageous reimbursement, MIHIR TANEJA would create another product name and new NDC number.

131.    Often MIHIR TANEJA created labels and listed them with PBMs to have the TANEJAS' related or controlled pharmacies perform test-runs of pharmacy benefit reimbursement through insurance Payers, such as TRICARE, to see which product labels and NDCs would reimburse the highest with inflated AWPs before producing batches of product. MIHIR TANEJA would assign NDC numbers to these products.

132.    The TANEJAS' related or controlled pharmacies included Drug Depot, Inc., dba APS Pharmacy in Palm Harbor, Florida; one of the largest specialty pharmacies in the country with a major focus on providing compounded ophthalmic medications (e.g., SMARTDROPS) and run by BILL LAGAMBA, who is believed to be JUGAL TANEJA's business partner, but appears more like an employee of the TANEJAS.

133.    SMARTDROPS were alleged to have been produced in bulk batches rather than being compounded for individual patients.

25

134.    SMARTDROPS was advertised as "a patent pending pharmaceutical solution matrix technology created specifically for stabilizing multiple active pharmaceutical ingredients (API) that do not typically mix."

135.    The patent pending aspect is believed to have been untrue and false advertising.

136.    Upon information and belief, SMARTDROPS were abruptly halted when the formulation inside eye dropper bottles suddenly precipitated as a green crust.

137.    STERLING, through ARUN KAPOOR, also had access to networks of private pharmacies to test reimbursements.  MIHIR TANEJA was witnessed on a computer manipulating and inflating AWP pricing before submitting to PBMs, while bragging about it.

138.    MIHIR TANEJA also boasted how he priced patches at $3,500 through these schemes and about how many millions of dollars he was making from these schemes, with no regard or remorse for patient safety.

139.    ARUN KAPOOR, in his BELCHER office, showed Relator spreadsheets of tens of millions of dollars in STERLING profits obtained through these fraudulent analgesic schemes, and bragged about it.

140.    ARUN KAPOOR also described his own network of private pharmacies, which he had influence over.

141.    ARUN KAPOOR described to Relator how these private pharmacies are located in clusters with prescribing physicians that are marketed to by these private pharmacies, and it is believed kickbacks and profit-sharing arrangements for prescriptions comprised this pharmacy scheme.

142.    BELCHER's CFO also confirmed to Relator that STERLING was bringing in tens of millions of dollars from these schemes.

26

143.    Lidopril Kit (NDC 69336-0825-01) was Lidopril XR sold in a kit that included three 30-gram tubes of Lidopril and 20 occlusive dressings, and believed to be marketed as a pain patch.

144.    Lidocaine 5% ointment (NDC 69336-0103-35) is a generic topical drug indicated for production of anesthesia of accessible mucous membranes of the oropharynx; and as an anesthetic lubricant for intubation; and for the temporary relief of pain associated with minor burns, including sunburn, abrasions of the skin, and insect bites. Lidocaine 5% ointment is a local anesthetic for infrequent or acute use.

145.    In contrast, STERLING and its network of pharmacies and prescribing doctors are believed to have marketed and/or encouraged frequent and/or chronic home use for self-administration for treating general pain as an off-label indication. Chronic overdosing of this product could lead to systemic effects and toxicity.

146.    Lidocaine Cream is not currently approved; only Lidocaine 5% Ointment is approved.

147.    Defendants told Relator that if Lidocaine Cream was approved with an NDA number, then PBMs would be forced to list Lidocaine Cream with MIHIR TANEJA's proposed inflated AWP, and insurance Payers would have a hard time denying claims for reimbursements. MIHIR TANEJA spoke of how much money such an approval would bring Defendants.

148.    The proposed indication for Lidocaine Cream was the same as that of Lidocaine Ointment, i.e., for the temporary relief of pain associated with minor burns, including sunburn, abrasions of the skin, and insect bites. These are acute indications. Defendants spoke of how the Lidocaine Cream would be used and marketed off-label for frequent, chronic use to make lots of money.

149.    Pre-Investigational New Drug (PIND) meeting request (PIND 129710) was submitted to the FDA Division of Anesthesia, Analgesia, and Addiction Products ("DAAAP") on February 16, 2016 and signed by ARUN KAPOOR for STERLING.

150.    MIHIR TANEJA was listed as an individual attending the meeting with the FDA for STERLING in the PIND package.  Written responses were provided from the FDA on July 19, 2016.

151.    Lidocaine Topical Cream was then scheduled for pharmaceutical development with a contract manufacturer for STERLING.

152.    However, contracts for pharmaceutical development in November 2019 were instead suddenly placed under MISEMER PHARMACEUTICAL, INC ("MISEMER"), with a business registered with the State of Mississippi, as well as, a believed pharmacy license registered with that state as well.

153.    The online address of MISEMER is 220 N Main St, Ripley, MS 38663, which is the same and/or an adjacent building to STERLING's nominal address of 106 East Mulberry Street in Ripley, Mississippi 38663.

154.    MISEMER is another company believed under the TANEJAS' control.

155.    It is believed that when Lidocaine Cream is ready for drug application filing, the application will come from MISEMER and Defendants are believed planning to obtain a PDUFA drug application fee waiver from FDA as MISEMER's first drug application filing.

156.    There are believed many other unapproved and/or monographed topical analgesic products sold through STERLING with inflated AWPs, including topical creams and patches.

157.    Lidovin Cream (NDC 69336-720-60) was a prescription 3.95% Lidocaine cream in a 60-gram tube, that was unapproved.

158.    There is also believed to be a Lidovex 3.75% lidocaine cream (NDC 69336-0700-60) and a Lidozol cream 3.75% lidocaine cream (NDC 69336-0710-60) which are unapproved.

159.    There was also believed a Lidopac Kit (NDC 69336-0829-01) that contained two tubes of Lidocaine 5% ointment and ten occlusive dressings, which upon information and belief is marketed as a pain patch.

160.    For Lidovex 3.75% lidocaine cream (NDC 69336-0700-60), STERLING is listed as the Labeler, while the product appears produced by ZHUHAI GUOJIA NEW MACROMOLECULE MATERIALS CO from China. However, there appears no indication on the box or product of Lidovex cream that it was imported from China, and therefore, is misbranded.

161.    There may be additional imported STERLING products not labeled with the country of origin, which could also make it difficult or impossible for the FDA to track if a recall was needed.

162.    Flexipak (NDC 69336-202-01) was a kit containing diclofenac sodium 75 mg tablets (a generic NSAID) along with a tube of capsaicin cream 0.025%, and marketed as if the kit was an approved abbreviated new drug application, even though the capsaicin cream from Rugby Laboratories was an OTC monograph unapproved drug. This unapproved kit is therefore misbranded.

163.    Adazin cream (NDC 69336-0500-02) is an unapproved combination drug containing Capsaicin 0.035%, Benzocaine 2%, Lidocaine 2%, and Methyl Salicylate 10% in a 60-gram tube.

164.    Four active analgesic/anesthetic ingredients in the same topical cream should have been tested for their drug interactions and stability, but was not believed tested. The labeling is inadequate for patient safety.

29

165.    Synvexia Patch Pad (NDC 69336-0200-30) contains 4% lidocaine and 1% menthol on an adhesive patch, and is an unapproved drug indicated for temporary relief of pain associated with minor cuts, scrapes and minor skin irritations.

166.    In contrast, STERLING and its network of pharmacies and prescribing doctors are believed to have marketed and/or encouraged frequent and/or chronic home use for self-administration for treating general pain as an off-label indication.  Chronic overdosing of this product could lead to systemic effects and toxicity.  This product is therefore misbranded.

167.    Synvexia TC Cream (NDC 69336-0201-60) contains 4% lidocaine and 1% menthol in a topical anesthetic cream and is an unapproved drug indicated for temporary relief of pain associated with minor cuts, scrapes and minor skin irritations.

168.    In contrast, STERLING and its network of pharmacies and prescribing doctors are believed to have marketed and/or encouraged frequent and/or chronic home use for self-administration for treating general pain as an off-label indication.  Chronic overdosing of this product could lead to systemic effects and toxicity.  This product is therefore misbranded.

169.    Upon information and belief, STERLING and Defendants adulterated products by having packaging facilities transfer the contents of tubes of over-the-counter ("OTC") creams and squirt them into empty tubes labeled as prescription (Rx only) for STERLING.

170.    Co-pays may not have been properly collected from patients.

**D.    Fraudulent Wound Gel Devices**

171.    STERLING attempted to seek 510(k) approval of a Lidotrex Wound Dressing Plus medicated wound gel of the product code FRO by submitting a 510(k) application to the FDA on August 4, 2016.  However, the statement of use was incorrect, not enough testing was performed,

30

and the contract manufacturer did not provide stability testing data, so that application K162202 was deficient and not approved by the FDA.

172.     STERLING then entered into contractual arrangement with MPM MEDICAL, INC to exclusively private label its Regenecare Wound Gel containing 2% lidocaine for STERLING on March 29, 2017.  ARUN KAPOOR signed this agreement on behalf of STERLING.  There was an annual minimum order quantity of 50,000 units added to renew exclusivity.

173.     This product was approved with 510(k) number K020540 many years prior.  MPM MEDICAL provided STERLING a letter of authorization for STERLING to list their medical device using MPM MEDICAL's 510(k) approval.

174.     This product was private labeled under the STERLING product name Lidotrex Gel 2% (NDC 69336-830-30).  MIHIR TANEJA assigned NDC numbers and inflated AWP to this product.

175.     MIHIR TANEJA created the artwork and labeling for Lidotrex and provided to MPM MEDICAL.

176.     Lidotrex Gel was indicated for the local management of painful skin wounds, including: pressure ulcers, venous stasis ulcers, superficial wounds and scrapes, and 1st and 2nd degree burns.

177.     Defendants unlawfully marketed Lidotrex Gel as if it was a pharmaceutical product (with an inflated AWP), and not a medical device product, through STERLING's network of pharmacies and prescribing doctors.

178.     Defendants unlawfully marketed Lidotrex Gel for frequent and/or chronic home use for self-administration for treating general pain as an off-label indication.  This product is therefore misbranded.

179.    MIHIR TANEJA created a sales sheet for Lidotrex for marketing purposes of this prescription-only product. The sales sheet clearly shows a $1,297.20 AWP for this 1-ounce (28.33 gram) tube of basically aloe with 2% lidocaine.

180.    STERLING purchases this product as private labeled from MPM MEDICAL for only $8. MPM MEDICAL retails its branded product Regenecare Wound Gel online in a 3-ounce (85 gram) tube for only $16.25.

181.    Defendants through STERLING later placed orders of Regenecare Wound Gel from MPM MEDICAL to be supplied in unlabeled, blank tubes.

182.    This use of unlabeled blank tubes allowed Defendants through STERLING to change tube labels (e.g., with sticker labels) as they saw fit to change product names and NDC numbers for reimbursement purposes.

183.    MIHIR TANEJA and ARUN KAPOOR later listed Regenecare Wound Gel with First Databank under product name Vexasyn Gel (NDC 69336-831-01), also in a 1-ounce (28.33 gram) tube.

184.    This redundancy allowed coverage if one product lost reimbursement coverage.

185.    Since Regenecare Wound Gel from MPM MEDICAL received premarket authorization in 510(k) number K020540 to be produced in a 3-ounce (85 gram) tube, Defendants had Lidotrex and Vexasyn produced in a 1-ounce (28.33 gram) tube so it would not be considered the same product for reimbursement as MPM MEDICAL's Regenecare Wound Gel to foster the reimbursement fraud scheme.

186.    However, STERLING is believed to have made commitments to MPM MEDICAL that STERLING would be responsible for testing the stability of the hydrogel in the smaller 1-

ounce (28.33 gram) tube.  Upon information and belief this stability testing has not been performed.

187.    Tetravex Gel 2% (NDC 69336-0823-30) is a 2% Tetracaine gel indicated for the local management of painful skin wounds, including: pressure ulcers, venous stasis ulcers, superficial wounds and scrapes, and 1st and 2nd degree burns.

188.    Tetravex Gel 2% is sold like a drug product with inflated AWP, even though this product was listed with listing databases/data repository companies like Medi-Span and First Databank with a wound care medical device 510(k) number K020540, which belongs to MPM MEDICAL, INC.

189.    MPM MEDICAL is not believed to have produced Tetravex Gel 2% for STERLING and the illicit use of 510(k) number K020540 for Tetravex is not believed to have been authorized by MPM MEDICAL.

190.    Pharmacy product information category for Tetravex Gel 2% includes "human prescription drug."

191.    The 510(k) number K020540 is for a wound hydrogel containing 2% Lidocaine, and not 2% Tetracaine; which is fraud and adulteration of switching active ingredients.

192.    Moreover, STERLING fails to list Tetravex Gel in the FDA medical device listing database to try to conceal this fraud and abuse.

193.    Since Tetravex Gel had not been believed produced by MPM MEDICAL or MPM MEDICAL's contract manufacturer, it is unknown where Tetravex was produced.

194.    Suvicort Rx Skin Emulsion (NDC 69336-0808-28 and -30 and -60) is a prescription hydrogel with 2% Lidocaine that uses MPM MEDICAL's 510(k) K020540, likely without MPM MEDICAL knowing.

195.    Foraxa Rx Skin Emulsion (NDC 69336-812-28) is a prescription hydrogel without Lidocaine in a 28-gram tube that uses MPM MEDICAL's 510(k) K020540, likely without MPM MEDICAL's knowledge.

196.    Medical devices, including the hydrogels above, such as Lidotrex with an FDA medical device product code MGQ, are considered adulterated or misbranded as drug products having STERLING's National Drug Code numbers appearing on them.

197.    The presence of the NDC numbers gave the false and misleading implication that the products were of pharmaceutical grade or quality, or were thought at least superior to similar medical device products on the market not having NDC numbers.  The FDA Center for Drug Evaluation and Research ("CDER") Office of Compliance has this to say about labeler codes:

> The labeler code is a unique 4- or 5-digit number assigned to any company that manufactures or distributes drug(s). Firms use this FDA assigned labeler code to compose a unique National Drug Code (NDC) for drugs they manufacture or distribute for commercial distribution in the United States. This NDC number is reported by labelers as part of their drug listing requirements. It is used by the FDA for surveillance and regulation of the pharmaceutical industry. It is also used by the Centers for Medicare and Medicaid Services ("CMS") as well as other government agencies and the medical insurance industry for reimbursement and other medical benefits.  **Assignment of NDC numbers to non-drug products is extremely prohibited.** Furthermore, assignment of an NDC does not denote approval or endorsement of the firm or its products by the FDA.  Any representation that creates an impression of such approval or endorsement because of the possession of an NDC is misleading and may constitute misbranding, resulting in legal action.

198.    The medical device product, Tetravex Gel, was commercialized without the Food and Drug Administration ("FDA") 510(k) premarket notification, and therefore, Defendants had attempted and conspired to commit health care fraud in violation of 18 U.S.C. §1349; along with 21 U.S.C. §331, 21 U.S.C §333, and 21 U.S.C §353.

199.    According to the FDA, "Under 18 U.S.C. §1001, anyone who makes a materially false, fictitious, or fraudulent statement to the U.S. Government is subject to criminal penalties."

This includes when listing (or not listing) medical device establishments and medical device products with the FDA.

200.    By not listing Tetravex with the FDA medical device listing database for STERLING, Defendants violated 18 U.S.C. §1001.

201.    Further, although Lidotrex and Vexasyn had 510(k) premarket notification, fraud and misbranding were committed on these products as well.

202.    These STERLING drug products may also have also been placed on preferred vendor formulary lists for workers' compensation dispensing, including by AUTOMATED HEALTHCARE SOLUTIONS.

203.    Upon information and belief, co-pays may not have been properly collected from patients.

E.    **Fraudulent Scar Care Devices**

204.    To diversify the STERLING product portfolio with additional items, as PBMs and insurance carriers were becoming aware of its schemes, MIHIR TANEJA searched for other topical medical device products, including silicone scar care devices.

205.    In one brazen example, MIHIR TANEJA and ARUN KAPOOR commandeered the name and premarket authorization of a discontinued Beau Rx silicone scar care product.

206.    MIHIR TANEJA and ARUN KAPOOR falsely claimed Beau Rx silicone scar care product's 510(k) number K083718 by listing this 510(k) number under STERLING's medical device establishment registration and device listing with the FDA.

207.    Defendants had placed this 510(k) number on a variety of products' labeling, including Beau Rx Silicone Scar Gel (NDC 69336-815-30), with pricing believed about $1,200; along with KelaRx scar care gel (NDC 69336-803-30), Silivex silicone scar pad (NDC 69336-

35

0802-02 and -04), and Silipac Kit (NDC 69336-0805-01) containing scar care gel and scar care pads.

208.    MIHIR TANEJA and ARUN KAPOOR were witnessed listing these products and 510(k) number K083718 for STERLING on the FDA Unified Registration and Listing Systems (FURLS) database for STERLING's medical device listing.

209.    Under 18 U.S.C. 1001, anyone who makes a materially false, fictitious, or fraudulent statement to the U.S. Government is subject to criminal penalties, which would apply in this case.

210.    MIHIR TANEJA and ARUN KAPOOR advised Relator they felt they could get away with this fraud because they read that the creator of Beau Rx, Tom McGraw of Beau Rx Solutions, had died some time ago and STERLING could pretend to have received or forge a 510(k)-authorization letter, **posthumously**, according to MIHIR TANEJA.

211.    Another time, MIHIR TANEJA told Relator that he [MIHIR TANEJA] would have an authorization letter prepared by one of his [MIHIR TANEJA's] friends in the United Kingdom or overseas, from an entity that the FDA would not be able to verify authenticity.  That overseas entity would falsely claim having licensed Beau Rx from Tom McGraw, and then provide STERLING authorization that the FDA could not check.

212.    Moreover, upon information and belief the formulation of STERLING's Beau Rx is not the same as that of the original Beau Rx Solutions product; another reason why the use of that 510(k) number would be fraudulent.

213.    The medical device product code MDA for silicone scar care products is class 1 premarket authorization exempt.

36

214. However, Defendants needed to list a 510(k) number with their scar care products listings with listing databases such as Medi-Span and First Databank to ensure these products would be reimbursed at high amounts by insurance Payers.

215. According to MIHIR TANEJA, it is believed that the listing databases would not list medical devices without a 510(k) number; listing database would otherwise deny such products as not having FDA approval.

216. These silicone scar care products from STERLING are labeled as prescription (Rx only), when there is no basis for them to be prescription only products, other than to promote the pharmacy fraud scheme and defraud government and private insurance Payers.

217. The STERLING products are no better than over-the-counter silicone scar creams and silicone scar sheets/pads one would buy at a supermarket, retail pharmacy, or online for $10 to $30.

218. Yet, STERLING and its network of dispensing pharmacies and prescribing physicians allegedly would write for STERLING scar products that would reimburse for many hundreds of dollars or more as part of this fraud scheme.

219. Medical devices, including the silicone scar care devices above, such as Beau Rx, KelaRx Silivex, and Silipac Kit, with an FDA medical device product code MDA, are considered adulterated or misbranded as drug products having STERLING's National Drug Code numbers appearing on them.

220. The NDC numbers gave the false and misleading implication that the products were of pharmaceutical grade or quality, or were thought at least superior to similar medical device products on the market not having NDC numbers.

221.   The FDA Center for Drug Evaluation and Research ("CDER") Office of Compliance has this to say about labeler codes:

> The labeler code is a unique 4- or 5-digit number assigned to any company that manufactures or distributes drug(s). Firms use this FDA assigned labeler code to compose a unique National Drug Code (NDC) for drugs they manufacture or distribute for commercial distribution in the United States. This NDC number is reported by labelers as part of their drug listing requirements. It is used by the FDA for surveillance and regulation of the pharmaceutical industry. It is also used by the Centers for Medicare and Medicaid Services ("CMS") as well as other government agencies and the medical insurance industry for reimbursement and other medical benefits. **Assignment of NDC numbers to non-drug products is extremely prohibited.** Furthermore, assignment of an NDC does not denote approval or endorsement of the firm or its products by the FDA. Any representation that creates an impression of such approval or endorsement because of the possession of an NDC is misleading and may constitute misbranding, resulting in legal action.

222.   These medical device products, including STERLING's Beau Rx and KelaRx silicone scar gels, Silivex silicone scar pad, and Silipac Kit, were commercialized and marketed falsely with an unauthorized 510(k) number that did not belong to Defendants.

223.   Defendants had attempted and conspired to commit healthcare fraud in violation of 18 U.S.C. §1349; along with 21 U.S.C. §331, 21 U.S.C. §333, and 21 U.S.C. §353.

224.   According to the FDA, "Under 18 U.S.C. §1001, anyone who makes a materially false, fictitious, or fraudulent statement to the U.S. Government is subject to criminal penalties." This includes when falsely listing medical device establishments and medical device products with the FDA. Defendants violated 18 U.S.C. §1001. Further, fraud, adulteration, and/or misbranding were committed on these products as well.

**F.    Mefenamic Acid Capsules**

225.   Another product that MIHIR TANEJA and ARUN KAPOOR licensed was mefenamic acid 250 mg capsules (ANDA 091608) private labeled to BELCHER (NDC 62250-103-10).

226.    The mefenamic acid 250 mg capsules was marketed to pharmacies and dispensing physicians, with an AWP of approximately $500, average reimbursement of $375 and a profit of $95 to the pharmacies.

227.    Relator witnessed marketing team meetings and discussions with MIHIR TANEJA, JIM DULANEY, and MATT HAGGARTY of CROSSLINK/STRYKER ORTHOPEDICS distributor (CROSSLINK LIFE SCIENCES, CROSSLINK BIOSCIENCE, CROSSLINK ORTHO) for this product. Relator was aware physicians were being off-label marketed to for this product.

228.    While NSAIDs generally have warnings about cardiovascular risk and gastrointestinal bleeding, the safety of mefenamic capsules was much more questionable. Mefenamic acid is an old NSAID originally approved in 1967 for relief of mild to moderate pain in patients ≥14 years of age, when therapy will not exceed one week (7 days), and for treatment of primary dysmenorrhea (menstrual cramps for 2 to 3 days).

229.    Unlike other NSAIDs, mefenamic acid is very restricted in its duration of use due to safety concerns. However, Defendants marketed this product as if it was equivalent to all other NSAIDs in terms of efficacy and safety; they encouraged and rewarded physicians to prescribe this drug for chronic (long-term) use, for general pain, even though many clients were hesitant.

230.    On July 26, 2018, BELCHER submitted a pre-Investigational New Drug ("PIND") meeting package to discuss with the FDA Division of Anesthesia, Analgesia, and Addiction Products ("DAAAP") on February 14, 2019 for the removal of the one-week dosing limitation for mefenamic acid capsules.

231.    The FDA stated that "the labeling limits use to 7 days because of adverse events observed when mefenamic acid was dosed for over 7 days in the clinical trials supporting the

original NDA [for mefenamic acid (Ponstel) decades ago]," thus confirming worst fears about its

safety.

232.    So, there were obvious adverse safety findings that led to the limitation of use of

mefenamic acid for which Defendants attempted to have prescribing physicians and pharmacies

bypass with off-label prescribing for their own greed, while common sense indicated that it could

result in patient harm.  Defendants withheld from the FDA that BELCHER had been promoting

off-label extended and chronic use of mefenamic acid to patients for several years already prior to

the PIND meeting request, in violation of 18 U.S.C. §1001.

**G.    Ablysinol (Dehydrated Alcohol Injection)**

233.    The TANEJAS, through BELCHER and its subsidiary BPI LABS, LLC, devised a

monopolistic plan to greatly inflate the price of Dehydrated Alcohol Injection, an old

grandfathered drug, 10-fold by leveraging its orphan designation status to have other competitors

removed from the market.

234.    BELCHER launched its Dehydrated Alcohol Injection branded drug ABLYSINOL

(NDA207987) with a price of around $10,000 for a pack of ten 5 mL ampoules of pure ethanol.

235.    In previous years, Dehydrated Alcohol Injection sold for around $1,000 for a pack

of ten 5 mL vials (or ampoules) of pure ethanol.

236.    Sales of ABLYSINOL greatly increased after February 2020.  See Table below:

### Table of IMS Sales View Data of Dehydrated Alcohol Injection

| Molecule | Manufacturer | Product | Pack | 2018_Sales $ | 2018_Eaches | 2018_NSP Price | 2019_Sales $ | 2019_Eaches | 2019_NSP Price |
|---|---|---|---|---|---|---|---|---|---|
| ETHANOL | AKORN, INC | ALCOHOL DEHYDRATED 01/2012 AKO | VIAL 98% 5ML | $86,780 | 2,170 | $39.99 | $80,965 | 2,016 | $40.16 |
| ETHANOL | AKORN, INC | ALCOHOL DEHYDRATED 01/2012 AKO | VIAL 98% 5MLX10 | $10,545,197 | 97,480 | $1,081.78 | $10,215,292 | 82,760 | $1,234.33 |
| ETHANOL | AMERICAN REGENT | DEHYDRATED ALCOHOL 03/1988 A-R | AMP 98% 5MLX10 | $3,248 | 60 | $$41.33 | | | |
| ETHANOL | BPI LABS | ABLYSINOL 10/2019 BPO | AMP 99% 5MLX10 | | | | $30,746 | 30 | $10,248.67 |
| ETHANOL | FLON LABORATORIES | ALCOHOL DEHYDRATED 02/2018 F+N | VIAL 98% 1MLX5 | $153,115 | 2,145 | $356.91 | $181,682 | 2,555 | $355.54 |
| ETHANOL | FLON LABORATORIES | ALCOHOL DEHYDRATED 02/2018 F+N | VIAL 98% 5MLX5 | $856,818 | 9,615 | $445.56 | $184,852 | 2,070 | $446.50 |
| ETHANOL | SETON PHARM | ALCOHOL DEHYDRATED 12/2018 S1N | VIAL 98% 5ML | | | | $5,336 | 40 | $133.40 |
| ETHANOL | SETON PHARM | ALCOHOL DEHYDRATED 12/2018 S1N | VIAL 98% 5MLX10 | $330,470 | 2,590 | $1,275.95 | $10,337,730 | 103,610 | $997.75 |

237. In a news article dated February 12, 2020 by Ed Silverman, entitled "**After a new version of a decades-old drug gets orphan status, the price suddenly skyrockets**," FABIO LANZIERI, who is the president of BPI LABS, a BELCHER subsidiary explained "that the company invested 'multiple millions of dollars' to develop an active pharmaceutical ingredient, run clinical trials, and prepare its FDA marketing application, although he declined to be specific about how much was spent on these activities or the type of trials that were conducted to win approval."

238. These statements of FABIO LANZIERI provided to Mr. Silverman were untrue.

239. The FDA's Prescription Drug User Fee Act ("PDUFA") for orphan drug applications is waived (i.e., is free).

240. BELCHER received approval based on publicly available past clinical literature (i.e., journal articles). BELCHER neither conducted nor sponsored any new clinical trials for the approval of this drug.

241. The development cost of the ethanol active pharmaceutical ingredient was under $100,000.

242. In a news article dated February 19, 2020 by Ned Pagliarulo, entitled "**Biotech executives, having pledged fair pricing, criticize drugmaker for steep hike**," a group of eight leading biotech executives, along with a letter signed by over 200 biotech and pharmaceutical industry leaders, criticized BELCHER for ABLYSINOL's unfair high pricing.

243. In a February 2020 market analysis conducted by Vizient Inc., a large group purchasing organization ("GPO"), Vizient estimates that U.S. healthcare will experience a $1.1 Billion increase in spending over the next five years due to BELCHER's Dehydrated Alcohol price

41

increase. Annual spending would increase from $28 million to an estimated $215 million because of BELCHER's pricing.

244.    Upon information and belief, there are at most only a few thousand alcohol septal ablation procedures performed each year; a heart catheterization procedure where alcohol is injected into an artery inside the heart to thin septal walls of the heart.

245.    The entire total potential patient population for this orphan drug may only be about 16,000 individuals; individuals who have symptomatic hypertrophic obstructive cardiomyopathy ("HOCM") who are not candidates for surgical myectomy.

246.    In contrast, the U.S. market size for Dehydrated Alcohol Injection for unapproved indications (e.g., including neurolysis) is at least 114,000 vials per year according to IMS Health drug distribution databases ("IMS"), although other estimates are believed 300,000 vials per year from another manufacturer, as not all sales go through major drug wholesalers and appear in IMS.

247.    With BELCHER and BPI LABS' monopolistic pricing scheme, profit would be between $100 million and $300 million annually.

248.    If monopolistic exclusivity were to remain through the middle of year 2025, BELCHER and BPI LABS could expect between **$0.5 Billion dollars to $1.5 Billion dollars**. The cost of goods is nearly negligible for this product.

249.    In order for BELCHER and BPI LABS to be successful with this monopolistic pricing scheme, the vast majority of its sales and marketing (over 90% and likely over 95%) would be for **off-label indications use**, such as the grandfathered indications of previous products that BELCHER and BPI LABS had removed from market.

250.    This is considered false claims and unfair trade.

251.    ABLYSINOL (Dehydrated Alcohol Injection) is a drug product that will be used in physician practices, hospitals, surgery centers, and VA facilities and DHA; used for numerous different medical procedures covered by government and private PAYERS, including CMS; mostly in outpatient procedures; mainly for relief of intractable chronic nerve pain.   Such procedures may be related to one or more CPT procedure codes; such as CPT 64632 – destruction by neurolytic agent procedures on the somatic nerves (e.g., plantar common digital nerve for Morton neuroma); along with drug procedure code J3490 – non-oral unclassified drugs for injection.  CPT codes are used to report procedures and services to federal and private Payers for reimbursement of rendered healthcare.

252.    Defendants, through BELCHER, are also engaged in Unfair Competition and monopolist exclusive supply agreements with active pharmaceutical ingredient ("API") suppliers to preclude drug product manufacturing competitors from having access to API, thereby thwarting competition and competitor's filing of drug applications for different indications.

253.    This is believed the case with ethanol API for BELCHER's ABLYSINOL product, along with several other products and their corresponding APIs.

254.    Relator was tasked with API development and obtaining orphan drug approval of ABLYSINOL (Dehydrated Alcohol Injection) [NDA207987] for BELCHER.

255.    Relator was witness to numerous conversations with the TANEJAS for the off-label use, high pricing, monopolistic strategy for ABLYSINOL.

**H.    Launching Unapproved DESI Drugs**

256.    With its new $17 million injectables facility, BELCHER and its subsidiary BPI LABS are planning to launch a host of unapproved and/or Drug Efficacy Study Implementation

("DESI") drugs. Relator attended many product pipeline meetings at BELCHER and BPI LABS, which included discussions of these unapproved or DESI drugs.

257.    Some and/or all of these types of drugs may be considered illegal in some respects, as they have not been produced in the same facility in the same manner since before 1938.

258.    This includes Phenobarbital Sodium Injection (has potential to be used for lethal injection), Hyoscyamine Sulfate Injection (NDC 54288-111-01, -05 already commercialized), Tetracaine HCl Injection, Indigo Carmine Injection, and unapproved Epinephrine Chloride nasal solution for topical application.

259.    BPI LABS is also launching a number of 503B injectable products. The 503B facilities are a category of drug compounders called outsourcing facilities, which may produce large batches with or without prescriptions to be sold to healthcare facilities [such as hospitals] as office use only.

260.    Allegedly, the TANEJAS have donated at least $10 million to AdventHealth Tampa hospital for the creation of The Taneja Center for Innovative Surgery. Any selling of pharmaceutical products, including these 503B injectable products, to this hospital and/or dozens of other AdventHealth hospitals, could therefore be considered a giant kickback.

### COUNT I

### FEDERAL FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS

261.    Relator repeats and re-alleges all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

262.    Throughout the statutory period, Defendants presented or caused claims to be presented to CMS and their contractors for:

a.      medical devices and drugs that were not medically necessary, but that Defendants presented as medically necessary using false and misleading documents; and

b.      medical device and drugs that were illegally induced through offers of remuneration in violation of the AKS.

263.    Defendants knew that these misbranded and/or adulterated medical devices and drugs were not covered by Medicare and TRICARE, but chose to submit the claims anyway.

264.    In addition, Defendants knew that the claims for reimbursement for the medical devices and drugs were not true, accurate and complete; and that the claim did not comply with all applicable laws, regulations, and instructions for payment.

265.    Each such representation was false, for the reasons described above.

266.    Accordingly, Defendants knowingly presented or caused to be presented false or fraudulent claims for payment in violation of the FCA.

267.    The submission by Defendants of these false claims caused CMS and TRICARE to pay out monies that they would not have paid if they had known of the falsity of Defendants' claims and certifications.

268.    Each false or fraudulent claim thus submitted for payment are a separate violation of the FCA.

269.    By reason of the false or fraudulent claims that Defendants knowingly presented or caused to be presented, the United States has been damaged in a substantial amount, to be proven at trial.  Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S. C. §3730(d).

## COUNT TWO
## FEDERAL FALSE CLAIMS ACT: MAKING OR USING
## FALSE RECORD OR STATEMENT TO CAUSE FALSE CLAIM TO BE PAID

270.     Relator repeats and re-alleges all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

271.     As described above, throughout the statutory period, Defendants knowingly used false records and statements when it submitted or caused to be submitted these claims for payment, including false documentation that Defendants' medical devices and drugs complied with coverage requirements.

272.     Accordingly, Defendants knowingly used false records or statements material to false or fraudulent claims for payment in violation of 31 U.S.C. §3729(a)(l)(B).

273.     The submission of these false records or statements caused CMS and TRICARE to pay out monies that they would not have paid if it had known of the falsity of Defendants' records or statements.

274.     Each submission of a false record or statement is a separate violation of the FCA.

275.     By reason of the false or fraudulent records or statements that Defendants knowingly submitted, the United States has been damaged in a substantial amount, to be proven at trial. Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S.C. §3730(d).

## COUNT THREE
## FEDERAL FALSE CLAIMS ACT: CONSPIRING TO SUBMIT FALSE CLAIMS

276.     Relator repeats and re-alleges all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

277.     Defendants' managers, owners, directors and other employees conspired with each

46

other and unnamed parties to seek and obtain payments by submitting or causing to be submitted claims based on fraudulent representations and records.

278.    Accordingly, Defendants knowingly conspired to defraud the United States by getting false or fraudulent claims allowed or paid, in violation of FCA and conspired to commit violations of the FCA.

279.    By reason of the false or fraudulent claims that Defendants conspired to get allowed or paid, or by reason of its conspiracy to violate the FCA, the United States has been damaged in a substantial amount, to be proven at trial.   Relator therefore respectfully requests an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relator the maximum award permitted under 31 U.S. C. §3730(d).

WHEREFORE, Relator respectfully requests that this Court enter judgment in his favor and that of the United States, and against Defendants, granting the following:

(a)    An award to the United States for treble its damages, in an amount to be determined at trial, plus a statutory penalty for each violation of the FCA;

(b)    An award to the United States for its costs pursuant to 31 U.S.C. §3729(a)(3);

(c)    An award to Relator in the maximum amount permitted under 31 U.S.C. §3730(d)

(d)    An award to Relator of his reasonable attorneys' fees, costs, and expenses he incurred in prosecuting this action;

(e)    Awards to the United States and to Relator for their costs of court;

(f)    Awards to the United States and to Relator for pre- and post-judgment interest at the rates permitted by law; and

(g)    An award of such other and further relief as this Court may deem to be just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relator demands trial by jury on all questions of fact raised by the Complaint.

Respectfully submitted,

/s/ Ryan D. Barack
**Ryan D. Barack**
Florida Bar No. 0148430
Primary: rbarack@employeerights.com
Secondary: jackie@employeerights.com
**Michelle Erin Nadeau**
Florida Bar No. 0060396
Primary: mnadeau@employeerights.com
Secondary: jackie@employeerights.com
**Kwall Barack Nadeau PLLC**
304 S. Belcher Rd., Suite C
(727) 441-4947
(727) 447-3158 Fax
Attorneys for Relator